IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PAUL MEDRANO, on his own behalf and
on behalf of all others similarly situated[1],

    Plaintiff,

vs.                                                          Civ. No.  16-350 JCH/KK

FLOWERS FOODS, INC., and
FLOWERS BAKING CO. OF
EL PASO, LLC,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendants' *Opposed Motion for Decertification of the Conditionally Certified Collective Action* [Doc. 158]. Plaintiffs have filed a response [Doc. 168] and Defendants have filed their reply [Doc. 178]. After considering those briefs, the relevant law, and the evidence, the Court concludes that the motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants Flowers Foods, Inc. ("Flowers Foods") and Flowers Baking Co. of El Paso, LLC ("Flowers El Paso") develop and market bakery products for national sale and distribution. [Doc. 168-2]. Defendants hire distributors to deliver their products to their customers. Plaintiffs claim that Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., by misclassifying the Plaintiffs, who are distributors of the baked goods, as independent

---

[1] On May 21, 2020, Paul Medrano's claims against Defendant were dismissed, along with those of the other New Mexico plaintiffs. [Doc. 184]. While his name should no longer appear in the caption, the parties have not notified the Court of any other person whose name should appear in its place.

contractors. This misclassification, Plaintiffs claim, has deprived them of overtime pay due under

the FLSA. In a previous Memorandum Opinion and Order, the Court granted conditional

certification of the FLSA claim, but denied it as to Plaintiff Paul Medrano's request for conditional

certification of his New Mexico Minimum Wage Act ("NMMWA"), N.M. Stat. Ann. § 50-4-22 et

seq. The conditional certification order directed the original named Plaintiff, Paul Medrano, to

send notices to potential plaintiffs of their right to opt into the lawsuit.

After the opt-in notices were sent out, approximately twenty-four additional delivery

drivers joined the case as plaintiffs. However, sixteen of them either settled their claims or were

otherwise dismissed [Docs. 50, 149, 150, 184], including the original named Plaintiff, Paul

Medrano. Currently, only nine opt-in Plaintiffs remain. No lead plaintiff has been identified.

Defendants now ask the Court to decertify the collective action, arguing that the various

Plaintiffs in the case "have offered starkly different testimony on multiple issues in this case" and

therefore the case is unsuited to a collective action.

## **LEGAL STANDARD**

The standard for certifying an FLSA collective action is fairly loose initially, requiring only

"substantial allegations that the putative class members were together the victims of a single

decision, policy, or plan." *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir.

2001); *Morisky v. Pub. Serv. Elec. and Gas Co.*, 111 F. Supp. 2d 493, 497 (D.N.J. 2000). However,

after the prospective class members have affirmatively expressed their desire to join the litigation

and discovery has been conducted—as is the case here—the defendant may file a motion for

decertification. Because at that point the record has been fully developed, the court applies a

"stricter standard." This includes analyzing several factors, such as "(1) disparate factual and

employment settings of the individual plaintiffs; (2) the various defenses available to defendant

which appear to be individual to each plaintiff; (3) fairness and procedural considerations ...."

*Thiessen*, 267 F.3d at 1102-03 (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)).

With respect to the first factor, the differing circumstances surrounding the individual plaintiffs' employment, the Tenth Circuit has used the "economic realities" test to determine whether someone is an employee entitled to overtime pay, or an independent contractor, who has no right to such pay. The Tenth Circuit has noted that in making such a determination, a reviewing court must "look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic reality, a worker is dependent on a given employer." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012) (citing *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)). The *Barlow* court advised that in applying the economic reality test, courts should consider

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. It also includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach.

*Barlow*, 703 F.3d at 506 (internal citations and quotations omitted).

In opposing a motion for decertification, Plaintiffs bear the burden of proving class members are "similarly situated." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (citations and internal quotation marks omitted).

## DISCUSSION

After considering the three factors set forth in *Thiessen* relevant to determining whether an FLSA case should be tried as a collective action, the Court concludes that decertification is not appropriate because the Plaintiffs remaining in the collective are substantially similar, and to a large degree their claims can be tried through representative proof.

### I.    Factual and Employment Settings of the Individual Plaintiffs

Among the evidence the parties have attached to their briefs are deposition excerpts from various plaintiffs. After the filing of these briefs, numerous plaintiffs settled their FLSA claims, or their claims were otherwise dismissed. As those individuals are no longer part of the proposed collective group, the Court has not considered their testimony, relying on testimony only by those plaintiffs who are still in the case. This had the effect of narrowing the diversity among the Plaintiffs' working conditions.

#### A.    Degree of control exercised by the employer over the worker

This factor focuses on whether the distributors have the independence "which characterizes a person conducting their own business." *Dole v. Snell*, 875 F.2d 802, 808 (10th Cir. 1989). The evidence suggest that the Defendants exercise a large degree of control over the Plaintiffs and the work they do. All distributors are subject to virtually the same Distributor Agreement and have no opportunity to negotiate terms. [Baldwin Dep. at 92-93]. All are contractually bound to follow "good industry practice" in their delivery work. Their tasks throughout the day are similar. Although their delivery routes vary in size and type of customer, the process of maintaining an adequate and fresh supply of Defendants' product on the shelf in accordance with the store's plan and removing the stale product does not vary among distributors, as per the written distributor agreements. The distributors are required to use handheld computers and mobile printers provided

by Defendants. [Baxley Depo. at 267; Del Campo Depo. at 7; Baldwin Depo. at 85-86]. Defendants require distributors to rent space at the company's warehouse to receive product. [Baldwin Depo. at 86-87].

Distributors must all attend the same training provided by Defendants. [Madrid Depo. at 50; C de Baca Depo. at 44]. A distributor who has difficulty with a store customer or retailer must repair the relationship and fix the problem, or Defendants will give that store to another distributor. [Baxley Depo. at 64]. Defendants also routinely visit stores to monitor the distributors' job performance. [Id. at 77]. The Distributor Agreement that distributors sign gives Defendants the power to discipline distributors through breach letters and termination of their employment. [Distr. Agrmt. § 16.1-16.3]. The Distributor Agreement contains a covenant not to compete, and it grants Defendants the right of first refusal in the event the distributor decides to sell his territory. [Id. §§ 20.8, 14.1].

Further, through their supply agreements (which Defendants negotiated without input from distributors) with the stores purchasing the bakery products, Defendants—not the distributors— control the details of distributors' work. [Baxley Depo. at 73-74; De Baca Depo. at 169-70]. These details include the price of the products, which stores to sell product to, which products to sell, and the amount of shelf space allotted. [Baxley Depo. 173-77; Baldwin Depo. at 110; De Baca Depo. at 108, 111; Del Campo. Depo. at 71-74; Havens Depo. at 129-131]. If a store requires delivery at certain times or days of the week, the distributor must comply. [Sosa Depo. at 116; Baldwin Depo. at 74-75]. The purpose of this is to protect Defendants' relationship with the retailer. [Baxley Depo. at 101-02].

Defendants point to variations among individual Plaintiffs' testimony regarding aspects of their daily operations, including whether they had the flexibility to operate other business or work in other jobs; hired helpers or serviced their territories themselves; set their own delivery schedule and route or if those were dictated by their customers; or were actually disciplined by sales managers through the use of "breach letters." [*See* Doc. 158 at 12-19]. However, much of the evidence cited by Defendants comes from plaintiffs who are no longer in the case. The variations in the remaining plaintiff-distributors' daily work activities are relatively minor and have little bearing on whether original and opt-in Plaintiffs are similarly situated. The factor weighs against decertification.

B.    Worker's opportunity for profit or loss

An independent contractor undertakes the risks of profit and loss, while an employee's ability to do so is limited. *See Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1223-24 (D. Kan 2008). As previously discussed, the evidence shows that supply agreements between Defendants and the national chain store retailers control virtually all business aspects of the relationship between the distributor and the retailer. For example, with a national account a distributor may not determine the price of a product, whether to put it on sale, or what product to sell in the first place. [Baldwin Depo. at 74-75]. Further, a distributor must continue to service a store that is part of a national account, even if it is unprofitable. [Baldwin Depo. at 78-79]. Such national chain accounts comprise the vast majority of distributors' business. [Havens Depo. at 83; Baldwin Depo. at 110]. The evidence concerning the relationship between Flowers Foods and each distributor in this area is very similar.

The Court is not persuaded by Defendants' argument that the opt-in Plaintiffs lack substantial similarity to each other because some of them either sold part of their territories (subject

to Defendants' right of first refusal) or purchased additional pieces of territory or used business cards to advertise their distributorship. These differences are relatively minor and have little impact on the nature of distributors' daily work. They do not undermine a determination that the Plaintiffs are similarly situated.

      C.      <u>Worker's investment in the business</u>

When a worker invests in his business, that constitutes evidence of independent contractor status. Defendants argue that the amount of investment varies considerably among the Plaintiffs in this case. For example, they argue that Plaintiffs bought different kinds of trucks to use in their distributorship, while others leased trucks. Defendants also point to differences in Plaintiffs' use of employees. However, it is virtually impossible to assess whether the Plaintiffs are similarly situated as to this factor because both Plaintiffs and Defendants cited and relied upon testimony from former plaintiffs who are no longer parties to this case. Thus, the Court concludes that this factor is neutral.

      D.      <u>Permanence of the working relationship</u>

"Independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." *Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1225 (D. Kan. 2008). In this case, the working relationship between Plaintiffs and Flowers Foods is governed by the Distributor Agreement. Under the terms of the Distributor Agreements and as owners of their routes, all distributors serve indefinitely, subject to potential termination by either party. The Distributor Agreements indicate a high degree of permanence in the working relationship, since their terms reflect an intent to form an ongoing relationship between distributors and Flowers, with no defined end date. This evidence will be the

same for all plaintiffs. The fact that there is variation in the actual number of years each distributor has worked for Defendants is not important for the purposes of determining whether the distributors are similarly situated. The issue of length of service becomes relevant only on the question of damages. There is no requirement that the distributors be *identically* situated to form a collective. *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001). Rather, it is enough that each had a long-term working relationship with Defendants governed by the Distributor Agreement. The factor weighs against decertification.

      E.        Degree of skill required to perform the work

"A requirement of specialized skill is indicative of independent contractor status." *Lewis*, 554 F. Supp. 2d at 1225. Defendant argues that the degree of skill among Plaintiffs varies, citing differences in whether Plaintiffs built relationships with customers in order to increase sales, engaged in word-of-mouth advertising, or used their judgment and experience to determine what and how much to order for a customer. However, the evidence Defendants cites from the remaining Plaintiffs does not indicate a large amount of diversity on this point. Whether distributors' work required independent initiative may be determined using common evidence. While Defendants contend that some distributors display more sales initiative and entrepreneurship than others, these "different tactics and attitudes" suggest variations in individual distributors' personal style, not their job requirements. All distributors were instructed to carry out their jobs according to the Distributor Agreement. These requirements do not vary between individual Plaintiffs.

Further, the evidence before the Court makes it clear that there are far more similarities in the operation of delivery routes than there are differences. There is no evidence that the distributor job requires particular training or education. [Baxley Depo. at 198; Madrid Depo. at 147]. The necessary skills include driving a commercial vehicle, organizing and delivering the right mix of

product to the right stores, removing the old product and straightening up the display, and doing all of this fast enough to complete the entire route in a reasonable period of time. It is not an easy job, but it is one which requires skills many people are able to acquire. This factor weighs against decertification.

              F.          <u>Extent to which the work is an integral part of Defendants' business</u>

This factor "presumes that with respect to vital or integral parts of the business, an employer will prefer to engage an employee rather than an independent contractor." *Lewis*, 554 F. Supp. 2d 1225. This factor also asks whether the Plaintiff distributors "depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1059 (2d Cir. 1988). In *Brock* the court found that nurses were integral to the business of their employer, a company that referred temporary health-care personnel—primarily nurses—to individual patients, hospitals, and nursing homes. In other words, it distinguished those who provide merely incidental services to the company from those whose work is at the core of the enterprise. Here, the distributors' work is at the core of the enterprise because without their labor the bakery products would have no way to arrive at retail outlets. Further, the evidence concerning the importance of the delivery of product to Defendants' business will be the same for each distributor. This factor weighs in favor of denying decertification.

## II.    **Defendant's Defenses**

The second factor to consider in a motion for decertification is whether there are various defenses available to defendant which appear to be individual to each plaintiff. Defendant contend that litigation of the defenses they plan to raise will require individualized proof specific to each Plaintiff. Plaintiffs, in turn, argue that the presence of defenses that might require individualized

inquiry does not mandate decertification because in this case, common issues and facts predominate.

A.      Motor Carrier Act

First, Defendants argue that even if some or all of the Plaintiffs are found to be employees under the FLSA, some or all of them are exempt from its overtime provisions due to the application of the Motor Carrier Act ("MCA"), which exempts from overtime any plaintiff who personally delivered product in a vehicle with a Gross Vehicle Weight Rating of at least 10,001 pounds in interstate commerce. *See* 49 U.S.C. § 31132, 29 U.S.C. § 213(b)(1). Thus, distributors driving vehicles over that weight would not be able to recover overtime wages under the FLSA. Defendants argue that this defense will require individualized assessments of whether each member of the collective used a vehicle lighter than 10,000 pounds, and how much time was spent in such a vehicle. Plaintiffs respond that the MCA defense can be litigated with representative evidence, asserting that all Plaintiffs have testified that in addition to driving a box truck, they drove their personal vehicles as a regular part of their jobs.

The question at this stage is whether common questions of law and fact exist that justify representational litigation. Defendants argue that "the individualized nature of this defense supports decertification because it impedes the efficient resolution of claims on a collective basis." However, the Court is not persuaded that the motor carrier exemption defense requires decertification. Evidence that Plaintiffs are similarly situated does not require absolute uniformity of behavior. There may be distributors who always use a large vehicle and are subject to the exemption, while there may be others who routinely use smaller vehicles. But this inquiry is relatively simple and does not justify creating multiple lawsuits to reach an answer.

Moreover, the motor carrier exemption defense is not unique to a specific plaintiff. Rather, it appears that Defendants are raising the motor carrier exemption defense against all Plaintiffs. A collective forum will not prevent Defendants from asserting the defense. And while its application might require specific factual inquiries about each Plaintiff's personal vehicle use, similar factual inquiries apply to each Plaintiff. Decertification would only require the court to apply the motor carrier defense in nine separate trials, which would not promote efficiency. Accordingly, common questions of law and fact justify collectively litigating whether the MCA exemption applies to Plaintiffs.

### B.        Number of Hours Worked

Defendants argue that they are entitled to defend themselves with individualized evidence regarding damages. They contend there is no way for Plaintiffs to establish with representative proof how many hours of overtime, if any, each of them worked. Defendants point to testimony showing that Plaintiffs' hours fluctuate or that they work different numbers of hours per week. Plaintiffs, in turn, argue that the fact that there are no records of Plaintiffs' hours worked is due to Defendants' policy of illegally misclassifying them as independent contractors. Plaintiffs then cite wage and hour cases from other district courts around the country that declined to decertify FLSA collectives due to a lack of records of number of hours worked.

The Court concludes that individualized inquiries into the number of uncompensated hours worked do not warrant decertification. If such inquiries on damages were an obstacle to collective resolution in FLSA overtime cases, very few could ever be decided on a collective basis. Moreover, Plaintiffs challenge the company-wide policy of classifying distributors as independent contractors, not individualized instances of failure to pay overtime. As discussed above, whether

distributers are improperly classified as independent contractors—and therefore entitled to overtime pay—is subject to generalized proof.

## III.     Fairness and Procedural Considerations

As previously stated, with the dismissal of Paul Medrano and many of the opt-in plaintiffs, there remain only nine plaintiffs in the case. The Court is aware that nine plaintiffs make a rather small collective. However, Defendants have not raised any objection to the case going forward on that basis. In addition, the Court is unaware of any minimum threshold number of plaintiffs necessary to move forward on a collective basis. *See Schilling v. PGA, Inc.*, 293 F.Supp.3d 832, 843 (W.D. Wis. 2018) ("While the number of class members is pertinent to class certification under Rule 23, defendant does not direct the court to any FLSA opinion requiring a threshold number to maintain a collective action. To the contrary, this court has declined to decertify a collective action where only eight employees opted in."). Accordingly, the fact that only nine plaintiffs remain in the case does not in and of itself pose an obstacle to certification.

As described in the preceding discussion of Plaintiffs' work, the factual issues concerning the supervision, autonomy, work practices and contractual relationship of the distributors and Flowers Foods are broadly similar across the territories and routes served by Plaintiffs in this case. The likelihood that individual distributors could effectively present their claims against the Defendants in multiple, individual federal lawsuits is extremely small in light of the expense of filing nine lawsuits with individual claims of modest size. Some issues, such as the amount of a particular distributor's wage award, would require an individual determination. But the majority of issues, including the elements of Plaintiffs' case-in-chief and the likely defenses, can be resolved using evidence applicable to most distributors. The Defendants will receive latitude in introducing evidence of the experience of outliers and any other employees who require special consideration.

But the record before the court at this stage strongly suggests that the requirements and execution of the distributors' job have far more in common from one distributor to the next than differences. The court is satisfied that broad concerns of fairness favor a collective resolution of the FLSA claims.

At the same time, the case is in the unusual posture of not having a named lead plaintiff after Paul Medrano settled his claim. Plaintiffs have not moved to substitute a new named plaintiff. Defendants have not moved to dismiss the case for lack of a lead plaintiff. In light of this circumstance, the Court hereby orders Plaintiffs to file a motion to name lead plaintiff (or some other procedurally appropriate motion) no later than fourteen days after entry of this Memorandum Opinion and Order.

## **CONCLUSION**

Having considered and weighed the disparate factual and employment settings of the individual plaintiffs, the various defenses available to defendant which appear to be individual to each plaintiff, fairness and procedural considerations, the Court concludes that this case is appropriate for collective action.

**IT IS THEREFORE ORDERED** that Defendants' *Opposed Motion for Decertification of the Conditionally Certified Collective Action* [Doc. 158] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs must move to name a new lead Plaintiff no later than fourteen days after entry of this Memorandum Opinion and Order.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**