**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**PAUL MEDRANO, on his own behalf and on behalf of all others similarly situated[1],**

**Plaintiff,**

**vs.** **Civ. No. 16-350 JCH/KK**

**FLOWERS FOODS, INC., and FLOWERS BAKING CO. OF EL PASO, LLC,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on *Defendants' Motion for Summary Judgment as to Various Defenses to Plaintiffs' Claims* [Doc. 159]. Plaintiffs filed their response [Doc. 171], and Defendants replied [Doc. 177]. Defendants ask for summary judgment on Paul Medrano's individual claim under the New Mexico Minimum Wage Act and on Charles Carroll's individual Fair Labor Standards Act ("FLSA") claims. These portions of Defendants' motion are moot because all claims asserted by both Medrano and Carroll have been dismissed. [Doc. 184]. Thus, the only issue before the Court is Defendant's contention that, as a matter of law, the Plaintiffs are exempt from overtime pay under the FLSA under the outside sales exemption. Because the Court concludes that there are genuine issues of material fact as to the applicability of the exemption, Defendants' motion will be denied.

---

[1] On May 21, 2020, Paul Medrano's claims against Defendant were dismissed, along with those of the other New Mexico plaintiffs. [Doc. 184]. While his name should no longer appear in the caption, the parties have not notified the Court of any other person whose name should appear in its stead. In a separate Memorandum Opinion and Order [Doc. 191], the Court has directed Plaintiffs to move to substitute a new lead plaintiff.

# FACTS

The Court considers only the material facts needed to decide Defendants' Motion for Summary Judgment. All facts come from the parties' briefings and accompanying exhibits. The Court resolves all disputed issues of material fact in favor of the Plaintiffs as the non-moving parties.

Defendant Flowers Foods, Inc. ("Flowers Foods") is the parent company of numerous subsidiary bakeries through the country, each of which is organized as a separate legal entity. Each entity is responsible for its own day-to-day operations. Defendant Flowers Baking Co. of El Paso ("FBC-El Paso") is a subsidiary bakery of Flowers Foods and is headquartered in El Paso, Texas.

## I. Distributor Agreements

Like its counterparts around the country, FBC-El Paso enters distributor agreements with the Plaintiff-distributors. Distributors purchase distribution rights to market and sell Defendants' bakery products within a defined geographic territory. The agreements, which are not subject to negotiation [Baldwin Dep. at 92-93], provide that FBC-El Paso will sell its products to the distributor "at such terms and prices as established by [FBC-El Paso.]" [Distributor Agrmt. § 4.1]. The agreement entitles Plaintiffs to turn around and distribute Defendants' branded products to "Outlets," retailers and restaurants in Plaintiffs' respective geographic territories. [*See* Doc. 168-7 at p. 1]. A distributor must use his "best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with good industry practice." [Distr. Agrmt § 5.1]. According to the agreement, a distributor is a "common law independent contractor." [Id. § 15.1].

In addition to classifying distributors as independent contractors, the distributor agreements require distributors to perform sales, deliveries, and service in compliance with "Good Industry Practice." The distributor agreement defines that term as

> the standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets requesting service, maintaining all equipment in a sanitary condition and in good safe working order, and operating the Distributorship in compliance with all applicable federal, state and local laws, rules and regulations.

[Distributor Agreement § 2.6]. Notably, only one duty on this list—"actively soliciting all Outlets not being serviced"—seems to relate in any way to sales.

The distributor agreements also include stipulations regarding the working relationship between each distributor and FBC-El Paso. For example, FBC-El Paso may change the "terms and prices" of their sales to distributors [Id. § 4.1]; distributors must use their "best efforts to develop and maximize" sales of "authorized products" in accordance with "good industry practice," and "cooperate" with marketing and sales efforts [Id. § 5.1]; deliveries need not be "conducted personally," so that distributors are "free to engage" outside assistance [Id. § 15.2]; FBC-El Paso may terminate the agreement if the distributor "fails to perform [the] obligations under this Agreement" [Id. § 16.1]; and FBC-El Paso may issue notices where it finds a distributor to be in breach of the agreement [Id. § 16.3].

Per the distributor agreements, distributors earn money by "purchasing" product at a specified discount and "selling" it at a higher price to customer stores such as chain grocers, independent grocers, restaurants, and cash customers. [Baldwin Depo. at 12-13, 109]. However, distributors are not able to negotiate the discount they receive on product obtained from FBC to

deliver to stores. [Baldwin Depo. at 110]. Distributors do not determine which products to sell, nor do they have the option not to carry certain products. [Havens Depo. at 78-79; Baldwin Depo. at 75].

To fulfill their obligations, distributors in the nationwide Flowers system use company-issued hand-held computers to submit orders on behalf of their customers' accounts, pick up the products from designated warehouses shortly after the products arrive, drive the products to customers' locations, deliver products to the shelves in customers' stores, periodically manage the inventory of products at those stores to ensure a steady supply of fresh product, and respond to concerns raised by store managers. *See, e.g., Noll v. Flowers Foods, Inc.*, 442 F. Supp. 3d 345, 351 (D. Me. 2020); Ruacho Depo. at 61; Soto Depo. at 25-26; Coronado, Jr. Depo. at 88; Rueda Depo. at 62-63. Because distributors' earnings are determined largely by the difference between what they pay FBC-El Paso and the price paid by customers at Outlets, Plaintiffs' income is primarily a function of the volume of products sold to customers. Distributors can increase their income by selling more products. [Soto Depo. at 21-22; Martinez-Gaytan Depo. at 39-40]. Thus, some testified that they attempt to develop and maximize the sales of products to their Outlets. [Coronado Jr. Depo. at 121-22; Ruacho Depo. at 46; Rueda Depo. at 61-62; Soto Depo. at 21]. A few occasionally attempt to secure new cash accounts at small independent stores in their territories, with limited success. [Soto Depo. at 33; Reyes Depo. at 54; Rueda Depo. at 69; Coronado Jr. Depo. at 63-64].

Distributors can also make money by selling all or a portion of their territory; they can also make the territory more valuable for resale by increasing their product sales within the territory. [Ruacho Depo. at 47-48; Reyes Depo. at 56; Soto Depo. at 32-33]. In addition, the distributors work to make sure the baked goods are displayed in a neat and attractive manner, and that the store

shelves are well-stocked. [Rueda Depo. at 62; Ruacho Depo. at 61]. Similarly, they remove stale product from the shelves. [Reyes Depo. at 46].

## II. Sales of Baked Goods Are Determined Largely by Agreements Between Defendants and Retailers

The parties dispute the extent to which distributors can impact the total volume of sales in their territories through their own efforts, but it is undisputed that the overwhelming majority of product is sold to the large, chain retailers who are Defendants' primary accounts. Defendants entered into Direct Store Delivery Agreements ("DSDs") with chain stores, and those agreements, to an extent, define items such as days of service and amount of bread delivered to store locations. [Del Campo Depo. at 80]. Distributors do not have any ability to contribute to or participate in the negotiation of the DSD agreements. [Id. at 71-73]. If a distributor fails to meet the DSD requirements, the company informs the distributor of the failure and FBC-El Paso could terminate the distributor's contract if the failure is not corrected. [Id.at 123-125].

The evidence shows that supply agreements between Defendants and the national chain store retailers control virtually all business aspects of the relationship between the distributor and the chain retailer. For example, with a national account a distributor may not determine the price of a product, whether to put it on sale, or what product to sell in the first place. [Baldwin Depo. at 74-75]. Further, a distributor must continue to service a store that is part of a national account, even if it is unprofitable. [Baldwin Depo. at 78-79]. Such national chain accounts comprise the vast majority of distributors' business. [Havens Depo. at 83; Baldwin Depo. at 110]. By contrast, independent stores, where a distributor might have the opportunity to increase sales, comprised approximately two percent of sales. [Havens Depo. at 83]. On the other hand, Defendants put forth

evidence that the handheld computing device devices used to submit orders contained a prepopulated suggested order for each Outlet, but some distributors testified they modify or adjust those suggested orders based on their own knowledge of sales trends for specific products, in anticipation of the impact of promotional, holiday, or seasonal changes, and based on other factors, including a consideration of the demographics of the typical shoppers at these customer accounts. [Ruacho Depo. at 63-65; Martinez-Gaytan Depo. at 50-51; Covarrubias Depo. at 53-54; Coronado Sr. Depo. at 101-102; Reyes Depo. at 95-96; Soto Depo. at 28-29]. Others ask store managers for displays or endcaps to shelve more products. [Coronado Sr. Depo. at 64-65, 67-68, 77-78; Reyes Depo. at 49; Ruacho Depo. at 46-47; Rueda Depo. at 62-63, 66, 71; Soto Depo. at 24, 28]. As distributors, Plaintiffs felt they are expected to attempt to develop and maximize sales of products. [Coronado Jr. Depo. at 121-22; Ruacho Depo. at 46; Rueda Depo. at 61-62].

FBC-El Paso controls sales in other ways too. Inside a particular chain store—again, the vast majority of the business—a schematic called a plan-o-gram shows a distributor which products he is required to stock in a particular store and may prescribe minimum, if not maximum, quantities. [Baldwin Depo at 75-77]. Distributors have no discretion to change the plan-o-gram. [Madrid Depo. at 53-54; Havens Depo. at 83]. In addition, distributors do not have the option to decline to participate in certain sales promotions. [Baldwin Depo. at 101-102; Del Campo Depo. at 72]. A distributor cannot drop an unprofitable account in his territory if it is a chain store. [Baldwin Depo. at 78-79; Madrid Depo. at 106–107; Del Campo Depo. at 142; Santos Depo. at 83]. Further, when opt-in plaintiff Carlos Rueda determined that an independent or cash store in his territory was not profitable for him, his supervisor still made him service the account. [Rueda Depo. at 109].

FBC-El Paso has discretion to waive stale charges when it wishes, in effect subsidizing the stale cost. [Baldwin Depo. at 42-43, 111]. Similarly, Defendants retain the right to change a distributor's product discount and increase his profitability. [Id. at 111; C de Baca Depo. at 229-230]. FBC-El Paso retains the discretion to make decisions that will affect the amount of money a distributor makes. [Del Campo Depo. at 146]. Indeed, FBC-El Paso had discretion to adjust discounts to ensure that distributors earned a certain amount of money per week. [Baxley Depo. at 248-249, 256–257]. The only way a distributor can improve the profitability of their route is to put extra bread on the shelves of their stores in an effort to sell more. [Madrid Depo. at 58].

Using the "pay by scan" system, neither FBC-El Paso nor the distributor get paid for product delivered to a chain store (such as Wal-Mart) until a loaf of bread is purchased by the end consumer, and the distributor would have no discretion or ability to determine what price would be charged. [Baxley Depo. at 97-98]. Under their arrangement with FBC-El Paso, there is a genuine issue of material fact as to whether distributors are paid by commission.

## III. Area Sales Directors Hold a High Degree of Responsibility for Sales

FBC-El Paso employs Area Sales Directors ("ASDs"). These sales managers instruct distributors as to what product to deliver or restock, and how often. [Baxley Depo. at 80]. Samuel Madrid, an ASD, testified that his job duties were to assist distributors, communicate with store managers, and gain sales through any means necessary; he informed distributors if their shelves needed additional inventory. [Madrid Depo. at 14]. At sales management meetings, which were not attended by distributors, attendees discussed ways to increase sales, such as pushing the distributors to order and sell more product. [Havens Depo. at 43-44].

ASDs received twice-yearly training on how to talk to store managers about selling FBC-El Paso's product. [Baxley Depo. at 41-42]. ASDs also had sales goals and were instructed to teach

the distributors "proper ordering." [Baxley Depo. at 239-40]. In 2018, the ASDs were trying to "…achieve a 3 percent sales growth in branded sales over prior year sales" and had financial incentives, in the form of bonuses, for reaching those goals. [Baldwin Depo. at 96-97]. One manager, Keith Havens, testified that he would increase a distributor's order when he was getting "pressure from El Paso to sell more of X, Y, Z" because he "had to do it somewhere." [Havens, 71:5-22]. Havens would make such adjustments on a weekly basis in order to make his own sales goals, and if a distributor complained Havens would ignore it, knowing that the distributor had no choice and would be charged for the extra baked goods. [Havens Depo. at 72, 74]. This practice was common knowledge among sales managers. [Id. at 73].

## LEGAL STANDARD

Under Rule 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Mitchael v. Intracorp, Inc*., 179 F.3d 847, 856 (10th Cir. 1999) (quoting *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998)). "A dispute is genuine 'if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.'" *Crowe v. ADT Sec. Servs., Inc*., 649 F.3d 1189, 1194 (10th Cir. 2011) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)). "A fact is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Id*. "In determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the nonmoving party." *Curtis v. Okla. City Pub. Sch. Bd. of Educ*., 147 F.3d 1200, 1214 (10th Cir. 1998). In this instance, the Court makes all reasonable inferences in favor of the Plaintiffs.

## DISCUSSION

### I. The FLSA and Corresponding Regulations

The FLSA requires employers to pay overtime compensation for an employee who works more than 40 hours per week. 29 U.S.C. § 207. However, the overtime provisions of the FLSA do not apply to any employee "employed in the capacity of outside salesman," as covered by the "Outside Sales Exemption" outlined in 29 U.S.C. § 213(a)(1). To show that workers are exempt from FLSA protections, "the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004).

The Fifth Circuit has explained that the

> logic of the exemption is that . . .[a] salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. . . . An outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works.

*Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (internal citation and quotation marks omitted). While Congress did not expressly define "outside salesman," in the statute, the Department of Labor has promulgated regulations relevant to the exemption. *See* 29 U.S.C. § 213(a)(1). An outside salesperson is defined by regulation as an employee:

> (1) Whose primary duty is:
>
> (i) making sales within the meaning of section 3(k) of the Act, or
>
> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a) (emphasis added). The term "primary duty" is defined at 29 C.F.R. § 541.700(a) and means "…the principal, main, major, or most important duty that the employee performs."

In *Christopher v. SmithKline Beecham Corp*., 567 U.S. 142, 148 (2012), the Supreme Court summarized the statute and DOL regulations: "[A]n outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." The definition of "sale" is broad, and the list of transactions defining a "sale" in the regulations represents "an attempt to accommodate industry-by-industry variations in methods of selling commodities." *Id*. at 163-64. In *Clements v. Serco, Inc*., the Tenth Circuit noted that the "…touchstone for making a sale, under the Federal Regulations, is obtaining a commitment. This can be done by making a sale or obtaining an order or contract for services." 530 F.3d 1224, 1227-28 (10th Cir. 2008).

Particularly helpful here is 29 C.F.R. § 541.504, titled "Drivers who sell." It provides:

> (a) Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a primary duty of making sales. In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work.
> (b) Several factors should be considered in determining if a driver has a primary duty of making sales, including, but not limited to: a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.
> (c) Drivers who may qualify as exempt outside sales employees include:
> (1) A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the

> product to the customer on a later trip, and who receives compensation commensurate with the volume of products sold.
>
> (2) A driver who obtains or solicits orders for the employer's products from persons who have authority to commit the customer for purchases.
>
> (3) A driver who calls on new prospects for customers along the employee's route and attempts to convince them of the desirability of accepting regular delivery of goods.
>
> (4) A driver who calls on established customers along the route and persuades regular customers to accept delivery of increased amounts of goods or of new products, even though the initial sale or agreement for delivery was made by someone else.
>
> (d) Drivers who generally would not qualify as exempt outside sales employees include:
>
> …
>
> (2) A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or the amount of the sale is determined by the volume of the customer's sales since the previous delivery.
>
> (3) A driver primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), unless such work is in furtherance of the driver's own sales efforts.

Finally, the Court notes that in *Encino Motorcars, LLC v. Navarro*, the United States Supreme Court explicitly rejected the proposition embraced by many lower courts that exemptions to the FLSA should be "construed narrowly" against the employer. 138 S.Ct. 1134, 1142 (2018). In *Encino*, the Supreme Court held that exemptions should be given a "fair (rather than narrow) interpretation" because exemptions are "as much a part of the FLSA's purpose as the overtime-pay requirement." *Id*. This Court will therefore apply the outside sales exemption fairly, not narrowly.

## II. Analysis

The decision on Defendant's motion for summary judgment turns on two questions. First, based on the evidence before the Court, could a reasonable jury conclude that the plaintiff-distributors do not make sales? And if not, could a reasonable jury conclude that making sales was not distributors' primary duty? If the answer to either question is in the affirmative, then the Court must deny summary judgment.

### A. A jury could conclude that the plaintiffs do not make sales

A jury could conclude from this evidence and deposition testimony that the plaintiffs do not actually make sales. All distributors are subject to virtually the same Distributor Agreement and have no opportunity to negotiate terms. [Baldwin Dep. at 92-93]. All are contractually bound to follow "good industry practice" in their delivery work. Their tasks throughout the day are similar. Although their delivery routes vary in size and type of customer, the process of maintaining an adequate and fresh supply of Defendants' product on the shelf in accordance with the store's plan, making it look neat and attractive, and removing the stale product does not vary among distributors, as per the written distributor agreements. FBC-El Paso's account managers exercise a large degree of control over the volume of product at a particular store through schematics called "plan-o-grams," [Baldwin Depo. at 75-77], although some distributors do feel free to adjust those amounts as they feel necessary. The distributors are required to use handheld computers and mobile printers provided by Defendants. [Baxley Depo. at 267; Baldwin Depo. at 85-86]. Defendants require distributors to rent space at the company's warehouse to receive product. [Baldwin Depo. at 86-87].

An additional piece of evidence suggesting that distributors do not make "sales" is the fact that they receive no compensation until a consumer purchases it from the store. Under the Tenth

Circuit's *Clements* decision, the essence of sales is "obtaining a commitment." 530 F.3d 1224, 1227-28. Here, distributors do not obtain a commitment from either the Outlets or the consumers. They do not sell to the retail customer whose transaction benefits them. Nor do they obtain commitments that stores will sell a certain amount of product to their retail customers—the only type of sale that results in profit to distributors. A jury could conclude that distributors' income, rather than being in their own control based on their own abilities and ambitions, is controlled primarily by Defendants, who set the prices at which distributors can sell their products, the Outlets they service, and the products they sell. In fact, there is evidence that Defendants sometimes force distributors to service unprofitable stores. From this, a jury could conclude that distributors' compensation is unlike the type of commission usually associated with sales and more like a service job. Plaintiffs put it well: "[A]lthough the Distributors' compensation is technically commensurate with the volume of product sold, they are compensated only for products sold *by* the store, not *to* the store, and the compensation even related to that sale is variable in FBC's discretion." Doc. 171 at 29 (emphasis in original).

Indeed, most of what distributors do is in the realm of promotional work such as stocking, arranging, and cleaning shelves and removing stale product, which is expressly excluded from the outside sales exemption. There is evidence that it is the Defendants themselves, through their DSD contracts with Outlets, who obtain orders or commitments, while the distributors merely make the products available for sale. Further, the fact that the plaintiffs sometimes adjust the orders for products on their electronic devices is not enough to transform their jobs from promotional work and inventory management to "sales." There is no evidence in the record that any of the work done by distributors has resulted in a meaningful increase in the sales of Flowers products. In *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 379 (6th Cir. 1970), a case involving "drivers who, in

servicing their routes, perform both delivery and sales functions," the court evaluated the applicability of the outside sales exemption. In that case, there was evidence that the drivers sometimes asked retailers for more shelf space for their products. Such "[s]olicitations would be an important, perhaps deciding factor, were other selling functions performed in the stores." In concluding that the drivers were not outside salesmen, the court emphasized that the defendant offered "no evidence that [the routemen's] solicitations [of additional shelf space] ever affected [sic] a significant increase in sales to a store independently of significant increases in consumer demand for appellee's products or the presence of an advertising promotion authorized by the chain which required additional stock." *Id*. at 383. In this case, there is no evidence that the work of the distributors increased the Defendants' overall sales, undermining the claim that that work they do consists of sales.

Finally, a jury could conclude that distributors do not meet the sample criteria for outside sales set forth in 29 C.F.R. § 541.504(c). Distributors are not the only sales contact between FBC-El Paso and the various Outlets; ASDs fill that role as well. *Compare id.* § 541.504(c)(1). There is no evidence that distributors obtain orders from anyone who has authority to commit an Outlet to make purchases. Indeed, under the sales model in place the Outlets don't purchase the bread at all, they merely make it available for sale to consumers. Any unsold bread goes back to Defendants. And even if the Outlets did purchase bread, there is no evidence that the store managers, with whom distributors do have contact, would have authority to commit to buying a particular amount. *Compare id*. § 541.504(c)(2). Although distributors do have the ability to call on new prospects in their respective territories, *compare id.* § 541.504(c)(3), the evidence supports the inference that distributors do this so rarely and obtain so little compensation as a result of such efforts that it could not be considered any part of their primary duties. *See* discussion *infra*. Finally, there is a

genuine issue of material fact as to whether distributors are able to persuade Outlets to accept delivery of more or new baked goods, or if they simply fill the allotted shelf space according to the pre-established plan-o-gram. *Compare* § 541.504(c)(4).

**B. A jury could conclude that making sales is <u>not</u> the plaintiffs' primary duty**

Even if we assume that the undisputed evidence shows that distributors' activities are "sales" within the meaning of the FLSA, the question remains as to whether such "sales" are their primary duty. Three considerations suggest otherwise.

First, there is evidence from which the jury could infer that the majority of distributors' time is spent driving a truck, unloading products, removing stale goods, stocking fresh product, and cleaning and arranging shelves. "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). From this broad range of responsibilities alone, some of them very physically demanding, a reasonable jury could conclude that making sales is not the primary responsibility of the plaintiffs.

Second, there is evidence from which a jury could conclude that most of distributors' activities are "promotional work" that is not exempt outside sales work. The federal regulations explain that

> [p]romotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

29 C.F.R. § 541.503(a). A jury could conclude that much of the distributors' work in ordering product, arranging shelves, and talking to store managers could be in furtherance of sales made by

the ASDs rather than in furtherance of the plaintiffs' own sales. The ASDs were given quotas and targets to meet, and it was their practice to push the distributors to put more product on the shelves to help meet those goals.

Third, there is little evidence that sales is the distributors' primary duty. While Defendants set forth several "Undisputed Material Facts" showing that Plaintiffs make sales as part of their job, there is not a great deal of evidence as to such sales being their primary duty, which is a requirement for the exemption to apply. As evidence that distributors' primary duty is making sales, Defendants note that several Plaintiffs admitted in deposition that they sold products, solicited new accounts, recommended changes to shelf space configurations, and other activities related to sales. However, such evidence is disputed, as it does not tend to show that sales were "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

Because there is a genuine issue of material fact both as to whether distributors engage in sales, and as to whether doing so was their principal or main duty, the motion for summary judgment will be denied.

**IT IS THEREFORE ORDERED** that *Defendants' Motion for Summary Judgment as to Various Defenses to Plaintiffs' Claims* [Doc. 159] is **DENIED**.

**UNITED STATES DISTRICT JUDGE**